**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-2073**

---

RICHARD P. HARROLD,

        Plaintiff – Appellant,

    v.

LEWIS J. HAGEN, individually and in his official capacity as an Officer of the Chesterfield County Police Department, Chesterfield County, Virginia,

        Defendant – Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, Chief District Judge.  (3:23-cv-00866-MHL)

---

Argued:  December 11, 2025                 Decided:  April 28, 2026

---

Before KING, HARRIS, and RICHARDSON, Circuit Judges.

---

Vacated and remanded by published opinion.  Judge King wrote the opinion, in which Judge Harris joined.  Judge Richardson wrote a dissenting opinion.

---

Robert Jackson Allen, THORSENALLEN, LLP, Richmond, Virginia, for Appellant.  Julie A. C. Seyfarth, CHESTERFIELD COUNTY ATTORNEY'S OFFICE, Chesterfield, Virginia, for Appellee.

---

KING, Circuit Judge:

In this appeal from the Eastern District of Virginia, plaintiff Richard Harrold challenges an adverse final judgment in favor of defendant Officer Lewis Hagen of the Chesterfield County Police Department. *See Harrold v. Hagen*, No. 3:23-cv-00866 (E.D. Va. Sept. 27, 2024), ECF Nos. 11 & 12 (the "Memorandum Opinion" and "Order"). By its Memorandum Opinion, the district court concluded — pursuant to Federal Rule of Civil Procedure 12(b)(6) — that Officer Hagen is entitled to qualified immunity from Harrold's Fourth Amendment excessive force claim, pursuant to 42 U.S.C. § 1983. That claim arises out of Hagen's allegedly illegal deployment of a police K-9 in December 2021, following a criminal break-in by Harrold into a car dealership in Chesterfield County.

On appeal, Harrold asserts that the district court's qualified immunity determination was legally erroneous, in that the Fourth Amendment right at issue — that is, the right of a non-threatening, unarmed, and passively-resisting suspect to be free from unnecessary, gratuitous, and disproportionate force by deployment of a police K-9 — was "clearly established" at the time the constitutional violation occurred in December 2021. As explained in further detail below, we agree with Harrold that such a Fourth Amendment constitutional right was clearly established. Accordingly, we are constrained to vacate the judgment and remand for such other and further proceedings as may be appropriate.

I.

A.

In December 2023, Harrold — an amputee missing his lower left leg below the knee, and who suffers from a serious medical condition that "can cause him to do things that are out of character for . . . which he later does not remember doing" — filed this lawsuit against Hagen in federal court in Richmond. *See Harrold v. Hagen*, No. 3:23-cv-00866, at ¶ 2 (E.D. Va. Dec. 20, 2023), ECF No. 1 (the "Complaint").[1]  As relevant to this appeal, the Complaint alleges a Fourth Amendment excessive force claim under § 1983, related to Harrold's unlawful deployment of force vis-à-vis a police K-9 named Kona ("K-9 Kona").[2]

---

[1] We accept and recite herein the well-pleaded allegations of the Complaint, in the light most favorable to the plaintiffs, as we are obliged to do at this stage in the proceedings. *See, e.g.*, *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999) (recognizing that, for purposes of Rule 12(b)(1), courts must "view[] the alleged facts [in the complaint] in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)").

[2] Count I of the Complaint alleged an unlawful seizure claim against Hagen in his individual capacity; Count II alleged an excessive force claim against Hagen in his individual capacity; and Count III alleged an official capacity claim against Hagen. For its part, the district court dismissed Count III, to the extent it was an improper official capacity claim, under *Ex Parte Young*, 209 U.S. 123 (1908). Additionally, the court viewed and considered Counts I and II as a "single claim for excessive force." *See* Memorandum Opinion 12. Harrold does not quarrel with either of those determinations. As such, we need not discuss the dismissal of Harrold's official capacity claim against Hagen, and we are otherwise satisfied to consider Counts I and II as a single excessive force claim.

In addition, the Complaint pursued five claims against Hagen under Virginia state law. Because it determined that Harrold's federal constitutional claim was without merit on qualified immunity grounds, however, the district court declined to exercise supplemental jurisdiction over the state law claims and instead resolved to dismiss those claims without prejudice. As discussed herein, because we are satisfied to vacate the judgment as to Harrold's Fourth Amendment excessive force claim, we also vacate the without-prejudice dismissal of Harrold's attendant state law claims. *See, e.g.*, *Lucas v.* (Continued)

3

The Complaint alleged, inter alia, that, on the night of December 26, 2021, Harrold — then a 44-year-old man measuring "approximately five feet, ten inches tall and weigh[ing] 145 pounds" — "broke a glass door and entered a used car dealership called VA Cars, located at 799 Midlothian Turnpike in Chesterfield County, Virginia." *See* Complaint ¶¶ 18, 19, 23. According to the allegations of the Complaint, Harrold was "unarmed" at the time the break-in occurred, but he had a "small utility knife in his pocket that he never removed or attempted to remove at any relevant time." *Id.* ¶ 21.[3]

As specified in the Complaint, "[a]n alarm was triggered" after Harrold broke into the dealership facility. *See* Complaint ¶ 24. The alarm triggered by Harrold resulted in a report to the Chesterfield County Police Department. To that end, law enforcement officers — including defendant Hagen and his police K-9, Kona — were dispatched to the scene.

According to the Complaint, "after police responded to the VA Cars location . . . Harold went up a flight of stairs and waited in a storage room." *See* Complaint ¶ 29. Harrold was purportedly "scared, confused, and did not know what to do, but he intended

---

*Henrico Cnty. Pub. Sch. Bd.*, 767 Fed. App'x 444, 448 (4th Cir. 2019) (explaining and concluding that "because the district court's decision to decline supplemental jurisdiction over the state law claims was based on its dismissal of all the federal claims . . . we also vacate that portion of the judgment" (citation modified)).

[3] The Complaint related that, according to an "Inmate Statement of Personal Articles" which had been completed upon Harrold's arrest, he "had in his possession a prosthetic leg, flashlight, debit cards, and a wallet with contents," plus a "small utility knife that was discovered by officers only after [Harrold] was in handcuffs and under arrest." *See* Complaint ¶ 53. Otherwise, a police sergeant testified at the preliminary hearing that he observed Harrold "in the building before the encounter with [K-9 Kona] and [Harrold] was unarmed and there was no reason to think he was armed." *Id.* ¶ 55.

to wait in the storage room until he was arrested." *Id.* ¶ 30. The Complaint further alleged that "Harrold had been sick and without much sleep for the four previous days and he was having an episode caused by his medical condition." *Id.* ¶ 31. And the Complaint alleged that Harrold "call[ed] out to the police, 'I am not a threat' or words to that effect." *Id.* ¶ 32. To that end, although "Harrold heard the sound of police officers" entering the VA Cars dealership, the Complaint alleged that he had otherwise "expected that . . . one of the officers would find him and arrest him without incident." *Id.* ¶ 33.

The Complaint then explained, however, that instead of the ensuing arrest being "routine and peaceful," it was "violent and gory." *See* Complaint ¶ 34. Specifically, the Complaint related that Hagen — accompanied by K-9 Kona, who was, at all relevant times "on a leash" — "began a search of the building." *Id.* ¶ 35. According to the Complaint, Hagen and K-9 Kona "located . . . Harrold in an upstairs storage room." *Id.* ¶ 37. To that end, upon Hagen and K-9 Kona's discovery of Harrold in the second-floor storage room of the VA Cars dealership, "Hagen did not announce his presence or give any warning at that time that he was going to release the K-9 if . . . Harrold did not comply with whatever order Defendant may have wanted to give." *Id.* ¶ 42. Rather, the Complaint alleged that "Hagen gave . . . Harrold no order at all." *Id.* As specified in the Complaint, while K-9 Kona was "directly fac[ing] . . . Harrold's rear end" in a narrow aisle of the storage room, "Hagen gave a signal to the K-9 to sic Harrold," who was at that point "in [a] . . . submissive, fetal-like position [on the floor] with his head down[.]" *Id.* ¶¶ 43, 45.

5

In that regard, the Complaint alleged that K-9 Kona "did not simply bite . . . Harrold and hold the same bite until an officer could perform an arrest," but rather "went into a full blown, violent attack." *See* Complaint ¶ 46. As for Hagen, the Complaint alleged that he "continued allowing [K-9 Kona] to attack . . . Harrold[.]" *Id.* ¶ 48. Notably, K-9 Kona's attack, as thoroughly detailed in the Complaint, was focused on the sensitive area of Harrold's "buttocks, anus and scrotum, along with his legs and his amputated stump." *Id.* ¶ 49. Ultimately, the Complaint specified that "[i]t took a considerable amount of time for . . . Hagen to separate [K-9 Kona] from . . . Harrold." *Id.* ¶ 50. Furthermore, "[r]ather than give clear, forceful commands to the K-9 in order to stop the attack . . . Hagen mainly tried to pull the dog's leash, much as an amateur, first-time dog owner might do." *Id.* ¶ 51.

According to the Complaint, Harrold suffered widespread and severe injuries as a result of K-9 Kona's attack, sustaining "deep dog bites over multiple areas of his body, some of which became infected." *See* Complaint ¶ 74. Immediately following the incident, Harrold was "bleeding profusely from the wounds sustained in the mauling." *Id.* ¶ 73. The Complaint specified that Harrold's "clothes, shoes, and prosthetic leg were covered in blood and his blood was smeared all over the floor where [K-9 Kona] attacked him." *Id.* Otherwise, Harrold's "prosthetic leg was destroyed by [K-9 Kona's] powerful jaws," and "[d]octors found a piece of the prosthetic's rubber sleeve imbedded in one of the wounds on . . . Harrold's leg where [K-9 Kona's] large teeth had sunk deep into his leg." *Id.* ¶ 75. In fact, Harrold's injuries were "so severe that a tourniquet and Israeli bandage were

applied at the scene to prevent him from bleeding out from his wounds." *Id.* ¶ 77.[4]

Eventually, Harrold was transported by Chesterfield County's Fire & Emergency Medical Services to Chippenham Hospital's Emergency Department for urgent medical care.[5]

Predicated on these allegations, the Complaint explained and pursued its Fourth Amendment excessive force claim against Officer Hagen, based on his unlawful deployment of K-9 Kona, which occurred after he discovered Harrold — in a "submissive, fetal-like position with his head down" — in the storage room on the second floor of the car dealership. *See* Complaint ¶ 45. The Complaint alleged that "it was objectively unreasonable for . . . Hagen, an officer who faced no immediate threat, to deploy a K-9 to effectuate a seizure of . . . Harrold as opposed to another method of arrest that did not involve such violence and risk of serious bodily injury or death." *Id.* ¶ 85. That is, Hagen's "actions in allowing . . . Harrold to be detained, bitten, attacked, and mauled by [K-9 Kona]

---

[4] An "Israeli bandage" — also called an "Emergency Bandage" — "is a specifically designed, first-aid device that is used to stop bleeding from traumatic hemorrhagic wounds in pre-hospital emergency situations." *See* Memorandum Opinion 6 n.6.

[5] Following his arrest, Harrold was charged with criminal offences under Virginia law. On September 16, 2022, Harrold pleaded guilty to "two misdemeanors, trespassing and vandalism." *See* Complaint ¶ 26. According to the Complaint, however, "[a]ll other charges [related to the incident] were dismissed upon the Commonwealth's motion to *nolle prosequi*." *Id.* Notably, the Complaint alleged that Harrold "was not suspected, accused, nor charged with any crime against any person (as opposed to property) or an offense that involves a threat of injury or violence against another person," nor was he "suspected, accused, nor charged with any offense involving violence or a threat of injury directed at any of the law enforcement officers who participated in his arrest, including the K-9 police dog and Officer Hagen, the dog's handler." *Id.* ¶¶ 27-28.

7

until he could be handcuffed and arrested, as described [in the Complaint], constitute[d] an unreasonable and unlawful seizure under the Fourth Amendment." *Id.* ¶ 86.

B.

1.

In January 2024, Officer Hagen moved to dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief could be granted. On the Fourth Amendment excessive force claim, Hagen argued that there was no constitutional violation because the use of force (i.e., deploying K-9 Kona to attack Harrold) was objectively reasonable. Hagen otherwise maintained that he was entitled to qualified immunity because the Fourth Amendment constitutional right at issue was not "clearly established" at the time the alleged violation occurred in December 2021.

As to the qualified immunity contention, Hagen maintained that, in light of "Body Worn Camera" video footage taken of the arrest (the "BWC footage"), Hagen had provided "five warnings prior to using [K-9 Kona] to aid him in seizing [Harrold]." *See Harrold v. Hagen*, No. 3:23-cv-00866, at 19 (E.D. Va. Jan. 11, 2024), ECF No. 6. According to Hagen, "[a]t the time of the events in question . . . the state of the law simply did not provide [him] with 'fair warning' that his conduct in this case would violate a constitutional rule," insofar as "most of the Fourth Circuit cases involving police canines that existed prior to December 26, 2021[,] focused primarily on the importance of law enforcement providing a verbal warning before releasing the K-9 or allowing it to bite an individual." *Id.* In that light, Hagen argued that "[t]here is not a single case with controlling authority that warns

8

police canine officers that it would be a violation of a burglary suspect's Fourth Amendment rights to be caught in the act and seized in his hiding place by a police K-9 after officers give multiple loud and clear warnings regarding the presence of the K-9." *Id.*

2.

In response, Harrold maintained that not only was Hagen's deployment of K-9 Kona objectively unreasonable, but also that his Fourth Amendment right to be free from excessive force was clearly established. *See Harrold v. Hagen*, No. 3:23-cv-00866, at 6, 13 (E.D. Va. Jan. 11, 2024), ECF No. 6 (the "Motion to Dismiss Response"). Turning to the clearly established prong of the qualified immunity analysis, Harrold explained that the Fourth Amendment "protects citizens against excessive force at the hands of law enforcement officers and '[a]n attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment excessive force violation.'" *See* Motion to Dismiss Response 15 (quoting *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 178 (4th Cir. 1998)). Harrold asserted that "[t]he fundamental question presented is whether it was clearly established that Officer Hagen, who faced no immediate threat, could order his leashed K-9 to bite Mr. Harrold, a suspect who presented no risk of fleeing." *Id.* at 21.

In maintaining that such a right was clearly established at the time of the violation in December 2021, Harrold relied on our 2013 decision in *Meyers v. Baltimore County,* for the proposition that "[t]he use of any unnecessary, gratuitous, and disproportionate force, whether arising from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured[.]" *See* Motion to

9

Dismiss Response 24 (quoting 713 F.3d 723, 734-35 (4th Cir. 2013)).  Given that "Hagen found . . . Harrold in [a] situation in which there was no need for significant force, there was no immediate threat to the police or anyone else, and there was no risk of . . . Harrold getting away," Harrold maintained that Officer Hagen's conduct in deploying K-9 Kona contravened Harrold's clearly established right to be free from such force.  *Id.* at 25.

C.

By Memorandum Opinion of September 2024, the district court determined that Hagen was entitled to qualified immunity from Harrold's federal excessive force claim. Despite ruling that the Complaint "plausibly allege[d] a [v]iolation of the Fourth Amendment," insofar as Hagen's "application of force was not objectively reasonable" under the Supreme Court's three-factor test for excessive force claims established in *Graham v. Connor*, 490 U.S. 386 (1989), the court concluded that the constitutional right at issue was not clearly established.  *See* Memorandum Opinion 17-18.  According to the Memorandum Opinion, Hagen "deployed a police dog to bite . . . Harrold, who had forcibly broken into a commercial building at night, who fled after CCPD officers arrived, and who, from a reasonable officer's perspective, could have been armed."  *Id.* at 21.

Crediting the Complaint's "well-plead[ed] allegation" that Hagen "failed to issue a warning" after locating Harrold, the district court resolved that Hagen's conduct "did not breach clearly established statutory or constitutional rights of which a reasonable person would have known," insofar as the BWC footage "shows that officers shouted at least six warnings regarding the presence of a police canine" before Hagen deployed K-9 Kona to

10

attack Harrold. *See* Memorandum Opinion 21.[6] On the basis that Harrold's constitutional right was not "clearly established" at the time of violation in December 2021, the court dismissed Harrold's Fourth Amendment excessive force claim, pursuant to Rule 12(b)(6).

* * *

On October 24, 2024, Harrold timely noticed this appeal from the Memorandum Opinion and Order. And we possess final decision jurisdiction under 28 U.S.C. § 1291.

II.

We review de novo a district court's Rule 12(b)(6) dismissal of a complaint. *See Evans v. United States*, 105 F.4th 606, 616 (4th Cir. 2024). As our Court has recognized, "[a] motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In order to survive a Rule 12(b)(6) dismissal motion, a complaint must allege sufficient factual information to "state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A

---

[6] Relying on our Court's recent decision in *Doriety for Estate of Crenshaw v. Sletten*, 109 F.4th 670 (4th Cir. 2024), the district court considered the BWC footage "to the extent it shows that officers shouted at least six warnings regarding the presence of a police canine," concluding that it "blatantly contradicts [the] Complaint to the extent it suggests that . . . Hagen failed to give any warning at all." *See* Memorandum Opinion 21. As discussed *infra*, the court's reliance on *Doriety* is of no moment to our determination that Hagen violated Harrold's clearly established right to be free from illegal excessive force.

complaint achieves facial plausibility when the facts alleged therein support a reasonable inference that the defendant is liable for the misconduct specified. *See Twombly*, 550 U.S. at 556; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In that regard, a reviewing federal court is obliged to assume all well-pleaded factual allegations in the complaint to be true and determine whether, viewed in the light most favorable to the plaintiff, those factual allegations "plausibly give rise to an entitlement to relief." *See Iqbal*, 556 U.S. at 679.

## III.

On appeal, Harrold challenges the district court's determination that Officer Hagen is entitled to qualified immunity, in that he maintains that the Fourth Amendment constitutional right at issue was clearly established at the time of the alleged violation in December 2021. Specifically, as to the second prong of the qualified immunity analysis, Harrold contends that the court erred in determining the nature and scope of the constitutional right at issue. To that end, although the court focused on the warnings given by Officer Hagen (and the failure to give a final warning before deploying K-9 Kona), Harrold maintains that the constitutional right at issue is more properly defined as the right to be free from "[a]n attack by an unreasonably deployed police dog in the course of a seizure." *See* Br. of Appellant 24. Put another way, Harrold says Hagen was not permitted to "improperly deploy[]" K-9 Kona to "maul[]" him, given that he was not a threat to the officers or others, he was unarmed, and he was laying passively on the floor. *Id.* at 27.

12

We agree with Harrold that the constitutional right at issue — that is, the Fourth Amendment right of a non-threatening, unarmed, and passively-resisting suspect to be free from unnecessary, gratuitous, and disproportionate force by deployment of a police K-9 — was "clearly established" in 2013, well before the alleged violation that was committed by Officer Hagen in 2021. Otherwise, we agree with Harrold that the district court overlooked that clearly established constitutional right by analyzing only whether Officer Hagen had provided Harrold with a final verbal warning immediately before deploying K-9 Kona.[7] We thus vacate the judgment and remand for further appropriate proceedings.

## A.

Section 1983 of Title 42 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013); *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023). Of relevance here, law enforcement officers sued in their individual capacities under § 1983 may invoke a claim of qualified immunity, which shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

---

[7] As to the issue of whether it was "clearly established" that Officer Hagen was obliged to give a final verbal warning immediately prior to deploying K-9 Kona in the manner alleged in the Complaint, our precedent is that law enforcement officers must give a "verbal warning before releasing [a police K-9]" to locate a suspect. *See Vathekan*, 154 F.3d at 180. We need not address here whether it is equally clear that law enforcement officers must give a verbal warning before deploying a *leashed* police K-9 to carry out a surprise attack on a suspect, because we are satisfied that Harrold's right to be free from excessive force itself was certainly clearly established.

13

a reasonable person would have known." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation modified). As we have recognized in that respect, the judicially-created doctrine of qualified immunity is designed to "protect[] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *See Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (citation modified).

As the district court recognized, our qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation. *See Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). If the answer on either question is "no," the officer being sued is entitled to qualified immunity. *See Pearson*, 555 U.S. at 232. Courts are entitled to exercise their discretion as to which prong is addressed first. *Id.* at 236. In assessing the propriety of a Rule 12(b)(6) dismissal on qualified immunity grounds, we are obliged to "accept[] as true the facts alleged in the complaint and view[] them in the light most favorable to the plaintiff" — here, Harrold. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006).

B.

Before turning to the two-prong qualified immunity test, "our first task is to identify the specific right that [Harrold] asserts was infringed by the challenged conduct [of Officer Hagen], recognizing that the right must be defined at the appropriate level of particularity." *See Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013). On that score, the Memorandum Opinion

14

focused on whether it was clearly established that Hagen was required to give Harrold a verbal warning immediately prior to deploying K-9 Kona in the manner alleged. To reiterate, Harrold says that this was a threshold error and caused the court to misapply the second prong of the qualified immunity analysis. We are constrained to agree.

Our assessment of the allegations of the Complaint leads us to conclude that Harrold is maintaining his Fourth Amendment claim based, in very substantial part, on Officer Hagen's allegedly unlawful deployment of K-9 Kona, which occurred after Hagen had discovered Harrold — who was in a "submissive, fetal-like position with his head down" — hiding in a storage room on the second floor of the VA Cars' dealership. *See* Complaint ¶ 45. The Complaint alleged that "it was objectively unreasonable for . . . Hagen, an officer who faced no immediate threat, to deploy a K-9 to effectuate a seizure of . . . Harrold as opposed to another method of arrest that did not involve such violence and risk of serious bodily injury or death." *Id.* ¶ 85. That is, Hagen's "actions in allowing . . . Harrold to be detained, bitten, attacked, and mauled by the K-9 police dog until he could be handcuffed and arrested, as described herein, constitutes an unreasonable and unlawful seizure under the Fourth Amendment." *Id.* ¶ 86. Based upon those specific allegations of the Complaint, we agree with Harrold that the constitutional right at issue is more properly defined as the right of a non-threatening, unarmed, and passively-resisting suspect to be free from unnecessary, gratuitous, and disproportionate force by deployment of a police K-9.

15

C.

1.

Against this backdrop, as to the first prong of the qualified immunity standard, we agree with and adopt the district court's cogent and detailed analysis that the Complaint plausibly alleges a Fourth Amendment violation. *See, e.g.*, Memorandum Opinion 17-20. Dutifully applying the three-factor test established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989), for assessing an excessive force claim, the Memorandum Opinion carefully reasoned and ruled that Harrold — who was discovered by Officer Hagen "lay[ing] motionless on the floor, with his head down" — did not pose an "immediate threat to the safety of the officers or others." *Id.* at 18-19.[8]  Indeed, Harrold was then and there "cornered," and when he was "confronted directly" by Hagen and K-9 Kona in the storage room, Harrold "engaged in passive, not active, resistance." *Id.* at 19.

Furthermore, the Memorandum Opinion recognized that, although Harrold had previously "fled up a flight of stairs" when law enforcement arrived at Harrold's location, after reaching the second floor he "waited in a storage room" and, when Officer Hagen

---

[8] *Graham v. Connor* stands for the proposition that a reviewing court is obliged to consider the following factors in assessing a Fourth Amendment excessive force claim: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *See* 490 U.S. at 396.  To that end, although *Graham* "frames the reasonableness determination in a larger perspective, evaluating all relevant factors rather than any one in isolation," *see Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994), our Court has recognized that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *See Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005).

16

encountered him in the storage room and released K-9 Kona, Harrold "was at most passively resisting by lying prone on the floor." *See* Memorandum Opinion 19. Coupling that with Harrold's "gruesome injuries that were so widespread and severe that they resulted in life-threatening blood loss requiring emergency medical intervention," the Memorandum Opinion ruled that, based on the well-pleaded allegations of the Complaint, the "prolonged deployment" of K-9 Kona by Hagen was "objectively unreasonable," given the totality of the circumstances leading up to Harrold's arrest. *Id.* at 20.[9]

2.

Turning now to the second prong of the qualified immunity analysis, as heretofore discussed, the central flaw in the district court's examination thereof is that it focused exclusively on the question of whether Officer Hagen provided a verbal warning immediately before deploying K-9 Kona. Rather, based upon the well-pleaded allegations of the Complaint, the Fourth Amendment right at issue is the right of a non-fleeing, non-threatening, unarmed, and passively resisting suspect to be free from unnecessary, gratuitous, and disproportionate force by an officer's deployment of a police K-9.[10]

---

[9] Officer Hagen attacks the district court's adverse determination that the Complaint plausibly alleges a Fourth Amendment excessive force violation related to his deployment of K-9 Kona, claiming we could affirm the judgment on that alternative ground. We have carefully assessed those contentions interposed by Hagen and deem them meritless.

[10] In his appellate brief, Officer Hagen — who has not been deposed in this litigation, nor given any sworn account of the relevant underlying events — has repeatedly maintained that, prior to the arrest, he believed Harrold was "armed" with a "weapon." *See, e.g.*, Br. of Appellee 19-20 ("An objectively reasonable officer would assume the felony burglary suspect, [Harrold], was armed or, at a minimum, had access to a tool or (Continued)

17

In answering that question in the affirmative, we recognize that our Court has "stated in forthright terms that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *See Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013). As explained by Judge Keenan in her *Meyers* precedent, "[t]he fact that the force used in the present case emanated from a [police K-9], rather than from a more traditional device, is not dispositive." *Id.* at 734-35. Rather, her opinion recognized, "[t]he use of any unnecessary, gratuitous, and disproportionate force, whether arising from a gun, a baton, a taser, or *other weapon*, precludes an officer from receiving qualified immunity if the subject is unarmed and secured." *Id.* at 735 (citation modified) (emphasis added); *see also, e.g.*, *Park v. Shiflett*, 250 F.3d 843, 852-53 (4th Cir. 2001) (concluding that use of "pepper spray" to subdue unarmed subject was irresponsible and excessive when subject was not threat to officer or public); *Orem v. Rephann,* 523 F.3d

---

weapon that could harm them."); *id.* at 20 ("The fact that numerous other officers responded to this call and held a perimeter with their firearms drawn reinforces the severity of the crime at issue, as well as the objective reasonableness of the immediate safety threat that officers perceived existed, including the threat that the suspect, [Harrold], may be armed with a weapon."). Put succinctly, those assertions in Hagen's brief are outside the four corners of the Complaint, which alleged that — after Harrold's arrest — officers discovered only a "small utility knife in [Harrold's] pocket." *See* Complaint 4. There is no evidence at this stage to support Hagen's belief that Harrold was "armed."

18

442, 449 (4th Cir. 2008) (concluding that taser used to "punish or intimidate" pretrial detainee was not objectively reasonable and contrary to clearly established law).[11]

In these circumstances, based on the well-pleaded allegations in the Complaint — viewed in the light most favorable to Harrold, *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) — an unarmed Harrold was discovered by Officer Hagen and K-9 Kona in a storage room on the second floor of the VA Cars dealership, *see* Complaint ¶ 21. Perhaps most importantly, Harrold was in a "submissive, fetal-like position with his head down" at the time he was discovered by Hagen. *Id.* ¶ 21.[12] As the district court related, Harrold was "passively resisting by lying prone on the floor." *See* Memorandum Opinion 19.

In this light, "[t]he use of any unnecessary, gratuitous, and disproportionate force, whether arising from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured." *See Meyers*, 713 F.3d at 735. To reiterate, on this record under Rule 12(b)(6), Harrold was unarmed and

---

[11] We observe that a trained police K-9 — like K-9 Kona — is rightly considered a "weapon" within the contours of the Fourth Amendment. *See, e.g.*, *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 178 (4th Cir. 1998) ("An attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment violation."); *Maney v. Garrison*, 681 Fed. App'x 210, 220 (4th Cir. 2017) (recognizing that "a bite from a police canine is a significant use of force"). To be sure, "[t]he force of a police dog's bite is between 1,200 and 2,000 pounds per square inch." *See Vathekan*, 154 F.3d at 177 n.3.

[12] Despite assertions by Officer Hagen's lawyer during oral argument, the BWC footage does not "blatantly contradict" the allegation in the Complaint that Harrold was submissive and in a fetal-like position when he was discovered by Hagen and K-9 Kona. *See Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679-80 (4th Cir. 2024). And the Memorandum Opinion is aligned with that proposition. *See* Memorandum Opinion 19 (recognizing that Harrold "was at most passively resisting by lying prone on the floor").

effectively secured by Officer Hagen, with several backup officers surrounding the enclosed storage room that was situated on the second floor. In that moment, the deployment of K-9 Kona to carry out an attack aimed at Harrold's most sensitive and private bodily areas — administered at the silent but explicit direction of Officer Hagen — was "unnecessary, gratuitous, and disproportionate." *Id.* And "because [Harrold] did not pose a threat to the officers' safety and was not actively resisting arrest [at the time he was discovered], a reasonable officer in [Officer Hagen's] position would have understood that his delivery of some, if not all, of the [dog bites] violated [Harrold's] Fourth Amendment right to be free from the use of excessive and unreasonable force." *Id.*[13]

---

[13] We pause at this final point to address three aspects of our spirited dissenting colleague's opinion. First, contrary to his suggestion, we are not "fail[ing] to apply binding Supreme Court precedent." *See post* 22. Rather, we — duty-bound and oath-sworn jurists — are simply applying the law to the facts of this case. That is, we are "call[ing] balls and strikes," *see Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (citation modified), in our humble effort "to get things right," *see Moreno v. Bolshem*, 151 F.4th 543, 558 (4th Cir. 2025).

Second, the dissent tellingly fails to mention the controlling reality that this appeal is from the district court's Rule 12(b)(6) dismissal of the Complaint on qualified immunity grounds. *Cf. Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014) (recognizing that "the [qualified immunity] defense faces a formidable hurdle" at Rule 12(b)(6) stage and "is usually not successful"). Further compounding that striking oversight, in attempting to refute the majority's definition of the "clearly established" at-issue Fourth Amendment constitutional right, every decision the dissent relies on — including the Supreme Court's recent decision in *Zorn v. Linton*, 146 S. Ct. 926 (2026) — was decided at summary judgment, rather than under Rule 12(b)(6). *See post* 25-27 n.3.

Third, instead of viewing the allegations of the Complaint in the light most favorable to plaintiff Harrold, our dissenting friend errantly discredits allegations of the Complaint and looks solely to the BWC footage, in an effort to bring in other facts that he deems relevant. *Compare post* 31 n.7 (proclaiming that Complaint has "falsely alleged that Officer Hagen issued no warnings whatsoever before deploying Kona"), *with* Complaint ¶ 42 (alleging that Officer Hagen did not "give any warnings *at [the] time*" K-9 Kona was (Continued)

IV.

Pursuant to the foregoing, we are constrained to vacate the judgment of the district court and remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*

---

deployed (emphasis added)). But at the Rule 12(b)(6) stage, that is a flawed standard. Rather, the BWC footage can now only be considered if it "clearly depicts a set of facts contrary to those alleged in the complaint, or blatantly contradicts the plaintiff's allegations, rendering [those] allegations implausible." *See Doriety*, 109 F.4th at 679-80 (citation modified).  As discussed *supra*, that is not the case here, and the facts the dissent may deem relevant — which are not alleged in the Complaint — are left for discovery.

RICHARDSON, Circuit Judge, dissenting:

I've said it before: "Qualified immunity is controversial, contested, and binding." *Aleman v. City of Charlotte*, 80 F.4th 264, 301 (4th Cir. 2023) (Richardson, J., dissenting). "While many criticize the doctrine, lower court judges are duty-bound to faithfully apply it so long as it exists." *Id.* In denying qualified immunity here, our Court again fails to apply binding Supreme Court precedent. Binding means binding. Inferior courts may not treat vertical stare decisis as voluntary.[1]

## I.      BACKGROUND

In December 2021, Richard Harrold shattered a glass door to break into a car dealership, triggering the alarm. When police arrived, Harrold refused to surrender. Instead, he fled upstairs and hid. After other officers secured the perimeter, Officer Hagen and his K-9, Kona, entered the building to search for Harrold. Officer Hagen shouted multiple warnings as he searched: "Come out now," or he would "release the dog and the dog bites." He shouted two more warnings in the room where Harrold was hiding.

---

[1] The Supreme Court has repeatedly corrected such defiance. *See, e.g.*, *Zorn v. Linton*, 146 S. Ct. 926 (2026) (per curiam); *City of Tahlequah v. Bond*, 595 U.S. 9 (2021) (per curiam); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) (per curiam); *City of Escondido v. Emmons*, 586 U.S. 38 (2019) (per curiam); *Kisela v. Hughes*, 584 U.S. 100 (2018) (per curiam); *District of Columbia v. Wesby*, 583 U.S. 48 (2018); *White v. Pauly*, 580 U.S. 73 (2017) (per curiam); *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam); *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015); *Carroll v. Carman*, 574 U.S. 13 (2014) (per curiam); *Plumhoff v. Rickard*, 572 U.S. 765 (2014); *Stanton v. Sims*, 571 U.S. 3 (2013) (per curiam); *Reichle v. Howards*, 566 U.S. 658 (2012); *Ryburn v. Huff*, 565 U.S. 469 (2012) (per curiam); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011); *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam).

But Harrold stayed hidden. When Officer Hagen and Kona found Harrold, Officer Hagen sicced Kona on him. In about thirty seconds, Officer Hagen handcuffed Harrold and pulled Kona off. After arresting Harrold, police found a utility knife in his pocket. The K-9's bite caused serious injuries that sent Harrold to the hospital.

Harrold sued, claiming that Officer Hagen violated his Fourth Amendment rights. Officer Hagen invoked qualified immunity. The district court held that Officer Hagen was entitled to qualified immunity—because the relevant right was not clearly established— and dismissed the suit. Harrold appealed.

## II.    DISCUSSION

The Majority reverses on the ground that Officer Hagen violated a clearly established right. But the Majority botches its analysis of the right at issue and fails to consider the perspective of a reasonable officer. Because the Majority's approach defies the Supreme Court's repeated instructions, I respectfully dissent.

### A.    The Majority's Analysis Of The Clearly Established Right Violates Supreme Court Precedent

The Majority holds that the following right is clearly established: "the right of a non-fleeing, non-threatening, unarmed, and passively resisting suspect to be free from unnecessary, gratuitous, and disproportionate force by an officer's deployment of a police K-9." Majority Op. at 17. That holding has two fatal flaws. First, it defines this right at

far too high a level of generality.  Second, even accepting the Majority's characterization of the right, no such right is clearly established.  I address each legal flaw in turn.[2]

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person could have known."  *Pauly*, 580 U.S. at 78–79.  We determine whether an officer receives qualified immunity by asking two questions:  (1) whether the officer violated a constitutional right, and (2) whether that right was clearly established.  *Wesby*, 583 U.S. at 62–63.

"[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  So the "focus" of the qualified immunity inquiry "is on whether the officer had fair notice that her conduct was unlawful."  *Brosseau*, 543 U.S. at 198.  The doctrine protects reasonable officers who try to comply with the law.

Consistent with this framework, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *al-Kidd*, 563 U.S. at 742.  "Principles stated generally," like the right of a non-threatening suspect to be free from the use of excessive force, "do not suffice," because they do not provide fair notice.

---

[2] "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.'"  *Elder v. Holloway*, 510 U.S. 510, 516 (1994).  Thus, the "existence of disputed material facts—which must be submitted to a jury—does not alter the 'essentially legal' nature of the question of whether the right at issue was clearly established."  *Willingham v. Crooke*, 412 F.3d 553, 559–60 (4th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020) ("the purely legal question of whether the constitutional right at issue was clearly established is always capable of decision at the summary judgment stage or on a motion to dismiss") (cleaned up and citation omitted)).

24

*Zorn*, 146 S. Ct. at 930. Who counts as non-threatening? How much force is excessive? Without answers to questions like these, an officer has no notice. That's why "[t]he relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *Wesby*, 583 U.S. at 63); *see Mullenix*, 577 U.S. at 12 ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (quoting *al-Kidd*, 563 U.S. at 742)).

Specificity is critical in excessive-force cases. The Supreme Court has hammered this home repeatedly. *See, e.g.*, *Mullenix*, 577 U.S. at 12 ("[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001))). Indeed, "excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 13). Regrettably, our Court continues to disregard the Supreme Court's instructions. *See, e.g.*, *Byers v. Painter*, No. 25-1058, slip op. at 28–36 (4th Cir. Apr. 17, 2026) (Diaz, C.J., dissenting). And today, the Majority continues this pattern of ignoring the Supreme Court, even after the Court reminded us of these principles just weeks ago in *Zorn v. Linton*.

In *Zorn*, the Supreme Court reversed the Second Circuit for doing what the Majority does today: defining the right too generally and relying on a materially dissimilar case to

deny qualified immunity. There, a protester sued police officers for using excessive force to remove her from a sit-in at the Vermont state capitol. *Zorn*, 146 S. Ct. at 929. When protesters remained after the capitol closed, "officers explained that they would arrest protesters for trespass if they did not leave." *Id.* One officer repeatedly asked the protester to leave and warned her that otherwise, he would use force to remove her. *Id.* When she refused, officers used a "rear wristlock" on her and "lifted her up by her underarm" before carrying her outside. *Id.* After she sued for excessive force, the Second Circuit denied the officer qualified immunity. *Id.* at 929–30.

The Supreme Court summarily reversed. It chided the Second Circuit for locating a clearly established right in a factually dissimilar case, *Amnesty America v. West Hartford*, 361 F.3d 113 (2d Cir. 2004). *Amnesty America* involved a far broader range of excessive-force allegations than *Zorn*, including "officers ramm[ing] a protester's head into a wall, dragg[ing] another protester across the ground, and us[ing] rear wristlocks on two more protesters to lift them up before throwing one of them to the ground." *Zorn*, 146 S. Ct. at 930. And, unlike in *Zorn*, "nothing" in *Amnesty America* "indicated that the officers gave the protesters any warning that they would use such force." *Id.* To the contrary, *Amnesty America* had "relied on a decision approving the practice of warning protesters and then using wristlocks to move them." *Id.* at 931. So "[r]easonable officials would not 'interpret [*Amnesty America*] to establish' that using a routine wristlock to move a resistant protester after warning her, without more, violates the Constitution." *Id.* (quoting *Wesby*, 583 U.S. at 63).

26

The Court added that *even if Amnesty America* had clearly established, in the abstract, that "the 'gratuitous' use of a rear wristlock on a protester passively resisting arrest constitutes excessive force," that proposition "lacks the 'high degree of specificity' needed to make it 'clear' to officers which actions violate the law." *Id.* at 930–31 (quoting *Wesby*, 583 U.S. at 63). That's because it "does not 'obviously resolve' whether using a rear wristlock to move a noncompliant protester after repeated warnings violates the Fourth Amendment, as it fails to specify which circumstances make the use of force 'gratuitous.'" *Id.* at 931 (quoting *Wesby*, 583 U.S. at 64).[3]

Today, the Majority repeats the Second Circuit's mistakes in *Zorn*. It announces a sweeping right that is untethered to prior precedent: "the right of a non-fleeing, non-threatening, unarmed, and passively resisting suspect to be free from unnecessary, gratuitous, and disproportionate force by an officer's deployment of a police K-9."

---

[3] The Supreme Court has rejected many other statements of so-called "clearly established" rights as insufficiently specific. Some examples include: "[A]n officer violates the Fourth Amendment when his or her reckless or deliberate conduct results in the need for lethal force or when the officers rely on lethal force unreasonably as a first resort in confronting an irrational suspect who is armed only with a weapon of short-range lethality and who has been confined on his own property," *Bond v. City of Tahlequah*, 981 F.3d 808, 825 (10th Cir. 2020), *overruled by City of Tahlequah*, 595 U.S. at 13; "the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); "the clearly established rule that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others," *Mullenix*, 577 U.S. at 12 (quotation marks omitted); and a "constitutional right to walk down [one's] driveway holding a knife without being shot," *Hughes v. Kisela*, 862 F.3d 775, 785 (9th Cir. 2016), *overruled by Kisela*, 584 U.S. at 105–08.

Majority Op. at 17. That right gives officers virtually no guidance.[4] "[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Kisela*, 584 U.S. at 105. Yet by stating the right so broadly, the Majority does just that. Rather than grounding the right in the case's specific circumstances, the Majority offers only sweeping labels, like "non-threatening," "passively resisting," "gratuitous," and "disproportionate." Those terms do not tell an officer what he may do. What makes a suspect non-threatening? What qualifies as "passively resisting"? When does K-9 force become disproportionate? May an officer deploy a dog when he reasonably believes a suspect is armed, or only when he knows it? The Majority's description of the alleged right answers none of these questions. That vagueness provides no fair notice and falls far short of the specificity the Supreme Court demands.

Even setting the specificity problem aside, the Majority's asserted right is not clearly established. A right is "clearly established" only when "existing precedent" places the "constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

For existing precedent, the Majority relies on a single case, *Meyers v. Baltimore County*, 713 F.3d 723 (4th Cir. 2013). But *Meyers* does not establish the broad right the

---

[4] At first glance, the Majority's right may sound fairly specific. After all, it uses seven adjectives—four to describe the suspect and three to describe the level of force used by the officer. But these lofty adjectives do little to describe the actual conduct involved. And the Supreme Court has emphasized (over and over) that it is the relevant conduct—not vague descriptors—that makes a right specific.

28

Majority attributes to it. *Meyers* involved force used after the threat had ended; this case involves force used to end a potential threat.

In *Meyers*, officers encountered a suspect acting erratically and wielding a baseball bat. 713 F.3d at 728. They used a taser to subdue him, and our Court held that the first three taser shocks, which caused the suspect to fall and drop the bat, did not violate the Fourth Amendment. *Id.* at 733. Once the suspect was on the ground, "several officers [sat] on his back." *Id.* at 735. At that point, the officers *knew* that the suspect had been disarmed and "effectively was secured." *Id.* at 735. Officers then tased the suspect an additional *seven times*. These subsequent shocks, which ultimately killed the suspect, violated the Fourth Amendment because he no longer posed a threat. *Id.* at 733–34. So our Court explained: "It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest." *Id.* at 734; *id.* at 735 (addressing the use of force when "the subject is *unarmed* and *secured*" (emphasis added)).[5]

*Meyers* turned on the officers' knowledge that the suspect had already been disarmed and secured. That is not the case here. If Officer Hagen had deployed Kona *after* securing Harrold, *Meyers* might supply an analogy. But Officer Hagen deployed Kona to

---

[5] Not only would a reasonable officer understand *Meyers* to address only a secured suspect, but later cases from our Court reasonably recognize that *Meyers* depends on the use of force after the suspect is disarmed and brought under control. *See, e.g.*, *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (describing *Meyers* as a case in which "the initial use of force was justifiable because the suspect had a weapon or was acting erratically, and the continued use of such force was unlawful because the threat was eliminated").

secure a hiding suspect whose threat level he could not have known. Unlike the suspect in *Meyers*, who stood in full view of the officers as he dropped his weapon, Harrold was hiding so Officer Hagen could not be sure that he posed no threat. And Officer Hagen quickly removed Kona once he handcuffed Harrold. "Suffice it to say, a reasonable police officer could miss the connection between the situation confronting" the officers in *Meyers*—a man already tased three times and completely subdued when they used additional force—"and the situation confronting" Officer Hagen—a possibly armed suspect, hiding from police and refusing to follow commands to reveal himself. *Kisela*, 584 U.S. at 108.[6]

One thing our precedent does clearly establish about using K-9s is that releasing a dog without warning is unconstitutional.[7] *Vathekan*, 154 F.3d at 179; *Kopf v. Wing*, 942

---

[6] Nor would a reasonable officer understand a prohibition on Officer Hagen's actions from *Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001), *Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008), or *Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998), cases the Majority only cites in passing. *See* Majority Op. at 18, 19 n.11. In *Park*, a couple accidentally triggered a store's alarm and called 911 to notify them about the accident. 250 F.3d at 848. Officers nevertheless violently arrested the couple, slamming them against the wall of a building and pepper spraying the wife. *Id.* In *Orem*, an officer tased a woman twice after police had arrested her, put her in the back of a police vehicle, and secured her with handcuffs and a foot restraint device. 523 F.3d at 444–45. And while *Vathekan* at least involved a K-9 bite, that's where the similarities with the case before us end. There, as police searched an apartment building for a potential burglar, one officer, without warning, unleashed a K-9 on Vathekan as she slept in her bed, and the K-9 mauled her. *Vathekan*, 154 F.3d at 175–77. These cases surely do not "obviously resolve whether" Officer Hagen's actions here "violate[d] the Fourth Amendment." *Zorn*, 146 S. Ct. at 931 (quoting *Wesby*, 583 U.S. at 64) (internal quotation marks omitted).

[7] Usually, a court will consider only the contents of the pleadings at the motion to dismiss stage. Yet a court "may consider documents attached to the complaint . . . [or] to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y* (Continued)

F.2d 265, 268–69 (4th Cir. 1991). But Officer Hagen gave repeated warnings, including in the room where Harrold was hiding.

Warnings do not automatically justify force. But warnings do matter, especially in excessive-force cases. *Zorn*, 146 S. Ct. at 930. They distinguish one factual setting from another. And factual distinctions are the heart of the clearly established inquiry. The Supreme Court underscored this point in *Zorn*: Officers who warn and officers who do not warn are not similarly situated. *Id.* ("Whether any particular use of force violates the Fourth Amendment depends on the facts and circumstances of each particular case, including whether the officer gave warnings before using force." (quotation marks and citations omitted)). The Majority brushes that aside. It says Officer Hagen's repeated

---

*of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). "And if the plaintiff adopts the contents of an integral and authentic document, a court can credit 'the document over conflicting allegations in the complaint.'" *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016)).

Special rules apply to video footage of police encounters at the motion to dismiss stage. *Id.* A district court may consider such footage "when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." *Id.* at 679–80 (quoting *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024)).

According to the Majority, "the [district] court's reliance on *Doriety* is of no moment to our determination that Hagen violated Harrold's clearly established right to be free from illegal excessive force." Majority Op. at 11 n.6. This is incorrect because, among other things, Harrold's complaint falsely alleged that Officer Hagen issued no warnings whatsoever before deploying Kona. Without Officer Hagen's body-worn camera footage, which blatantly contradicts these allegations, *Vathekan* would control this case. I would not dissent without this footage, because our Court has made clear that deploying a K-9 without warning is *per se* unreasonable.

31

warnings do not bear on whether the right is clearly established. *See* Majority Op. at 11 n.6, 12–13. *Zorn* says otherwise.

Finally, the Majority's description of the bite as "unnecessary, gratuitous, and disproportionate" also sits uneasily with our K-9 cases. Our precedent tells us that a thirty-second bite is not *per se* excessive. In *Putman v. Harris*, 66 F.4th 181, 183–84 (4th Cir. 2023), officers used a K-9 to search for a reportedly suicidal and possibly armed man hiding in the woods on his property. When they found Putman in a shallow ditch, they pointed a gun at him and warned that they would deploy the dog if he did not comply. *Id.* at 184 (warning Putman "[d]o you want to get dog bit?" and "[y]ou gonna get dog bit"). When Putman refused to comply with officers' commands, they simultaneously tased him and ordered the K-9 to bite. *Id.* at 184–85. The bite lasted about thirty seconds—the same as Kona's bite here. *Id.* at 185. We held that force was reasonable. *Id.* at 187 ("[S]ince this 'immediate safety risk [was] reasonably likely to be cured by' using the dog, [the officer's] deployment was justified." (quoting *Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 909 (4th Cir. 2016))). That does not mean a thirty-second bite is always reasonable. But the Majority never explains why a thirty-second bite is "unnecessary, gratuitous, and disproportionate" here but not in *Putman*.

The Majority relies on no other authority. It cannot, because the right comes from thin air. The properly specified right would actually be "the right of a fleeing, potentially armed, hiding suspect, in the process of committing a suspected burglary, to be free from the deployment of a police dog after repeated warnings to come out." Or perhaps, as the district court suggested, it could be the right to a "final warning" immediately before the

32

deployment of a police dog. *Harrold v. Hagen*, No. 3:23-cv-866, 2024 WL 4336745, at *10 (E.D. Va. Sept. 27, 2024). Neither right is clearly established in this Court or any other. And I doubt either exists. But at least these formulations try to obey the Supreme Court's demand for specificity. The Majority does not.

**B.      The Majority Does Not Consider The Totality Of The Circumstances From A Reasonable Officer's Perspective**

No clearly established law prohibited Officer Hagen's conduct. That alone should end the case. But the Majority also botches the first inquiry—whether the officer violated the Constitution—by ignoring the totality of the circumstances from the perspective of a reasonable officer on the scene. That mistake infects the rest of its analysis.

In the Fourth Amendment context, courts determine "whether the force used to effect a particular seizure is 'reasonable'" by considering the totality of the circumstances from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396 (1989). That objective inquiry turns on what the officer knew at the time. Officers "cannot be expected to respond to information they did not possess at the time they acted," *Melgar v. Greene*, 593 F.3d 348, 355 (4th Cir. 2010). And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments" in "tense, uncertain, and rapidly evolving" situations. *Graham*, 490 U.S. at 396–97.

A court must also "frame[] the reasonableness determination in a larger perspective, evaluating all relevant factors rather than any one in isolation." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). Last term, the Supreme Court clarified that "the 'totality of the

33

circumstances' inquiry into a use of force has no time limit." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). "While the situation at the precise time of [force] will often be what matters most, earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.*

The Majority's sparse analysis does the opposite. It isolates the instant Officer Hagen deployed Kona and ignores the events that gave that moment meaning. For example, it overstates the importance of Harrold's supposedly "submissive" body position, while discounting what happened earlier in the evening.[8] Recall that Harrold shattered a glass door, fled upstairs when police arrived, and kept hiding despite repeated commands to come out. The Majority nevertheless says he was not fleeing, even while acknowledging that Harrold "previously fled up a flight of stairs." Majority Op. at 16. The Majority's analysis refuses to consider how prior events would have shaped a reasonable officer's understanding of the encounter as it unfolded. *See Barnes*, 605 U.S. at 80.

The Majority goes on to claim that Harrold posed no immediate threat. Majority Op. at 16. But it says so from hindsight, not from the perspective of an officer on the scene. For example, when police arrived at the car dealership, Harrold fled upstairs and hid, so officers could not tell whether he was armed. When Officer Hagen found him, Harrold

---

[8] The Majority characterizes Harrold as simultaneously "lying prone" and being in a "fetal-like position." Majority Op. at 15, 17. Never mind that the two assertions contradict each other; Officer Hagen's body camera footage refutes both. The footage shows Harrold kneeling behind a box, hiding from police as Officer Hagen and Kona approached him. From that position, Harrold easily could have sprung up and attacked an officer with his utility knife or tried to escape.

34

was still hidden, and his hands were still out of view.[9]  The Majority never explains why a reasonable officer in these circumstances had to assume Harrold was unarmed.  It simply says that he was unarmed and that officers had no reason to think otherwise.  Our cases point the other way.  In *Rambert v. City of Greenville*, we recognized that "a breaking-and-entering with a glass break" could suggest "the possible use of a weapon" to "a reasonable officer."  107 F.4th 388, 400 (4th Cir. 2024).  And Harrold's own complaint alleges that he broke in by shattering a glass door—a fact that, from the officers' perspective, suggested he was capable of force.

This Court has *never* suggested that an officer must know with certainty that a suspect is armed in order to act as though the suspect is armed; a reasonable belief is enough.  *Putman* illustrates the point.  Putman's wife told police that he *might* have a gun and seemed suicidal.  66 F.4th at 183–84.  Even though Putman "claimed he was unarmed

---

[9] No case requires an officer to assume a hidden suspect is unarmed.  If anything, precedent about suspects hiding their hands "implie[s] the opposite."  *Zorn*, 146 S. Ct. at 931.  For example, in *McLenagan v. Karnes*, 27 F.3d 1002, 1004–08 (4th Cir. 1994), our Court found an officer's use of force against a handcuffed suspect reasonable, because the suspect's hands were out of view, and there was a possibility he had access to a firearm.  The suspect turned out to be unarmed, but this did not matter.  The Court did not "think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him" and refused to "second-guess the split-second judgment of a trained police officer merely because that judgment turn[ed] out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others."  *Id.* at 1007–08.  *See also Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) (collecting cases).

Similarly, here, Harrold's hands were out of view—indeed, during most of the search, his whole body was out of view.  And because Harrold broke glass to enter the dealership, Officer Hagen had reason to think he was armed.  *See Rambert*, 107 F.4th at 399.  If an officer may reasonably suspect that a person hiding *his hands* is holding a weapon, the same goes when the suspect hides *himself*.

during the encounter, [the police] couldn't confirm this because Putman refused to turn around to show his entire waistband." *Id.* at 187. Our Court concluded that "a reasonable officer could have believed Putman was armed and thus posed an immediate threat." *Id.* It did not matter that Putman did not turn out to have a gun. The same principle applies here. It does not matter that Harrold didn't have a gun—or that he did have a knife.[10] What matters is what a reasonable officer could have believed at the time. And a reasonable officer could conclude that a burglar who flees, refuses commands, and stays hidden presents a very real threat.

Harrold says he has a "condition" that causes him to act "out of character." He says he was afraid. He says he is small, frail, and an amputee. He says he intended to surrender peacefully. But none of that matters, because a reasonable officer could not have known any of it. Either the Majority has not viewed the events from the perspective of a reasonable officer, or it expects officers to read minds and see through walls.

These errors distort the Majority's analysis. On the facts as a reasonable officer could perceive them, Harrold was fleeing, potentially armed, and threatening. Only by

---

[10] "[W]hen the force would have been justified if the [officer's] belief had been correct, we have found no Fourth Amendment violation." *Milstead v. Kibler*, 243 F.3d 157, 164–65 (4th Cir. 2001) (granting qualified immunity to an officer who shot the plaintiff based on the reasonable but mistaken belief that the plaintiff was the perpetrator of a violent crime). *See also Belton v. Loveridge*, 129 F.4th 271, 278–79 (4th Cir. 2025); *Anderson*, 247 F.3d at 131 (officer acted reasonably when he fired at an unarmed suspect because he "had sound reason to believe" the suspect was armed); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998) (officer behaved reasonably when he shot a suspect he perceived as holding a knife, even though onlookers claimed they did not see a knife); *McLenagan*, 27 F.3d at 1007–08.

36

abandoning that perspective can the Majority describe Harrold as a "non-fleeing, non-threatening, unarmed, and passively resisting suspect." Majority Op. at 17.

*      *      *

The Majority flouts binding Supreme Court and Fourth Circuit precedent. It conjures a clearly established right and refuses to view the facts through the eyes of a reasonable officer. Harrold's injuries are regrettable. But sympathy is not law.

I respectfully dissent.